UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| UNITED STATES OF AMERICA | CIVIL ACTION |
| VERSUS | NO. 18-664-RLB |
| ONE HUNDRED SEVENTY-NINE THOUSAND DOLLARS IN UNITED STATES CURRENCY IN JPMORGAN CHASE BANK SAFE DEPOSIT BOX IN THE NAME OF TRAVIS JAMES | CONSENT CASE |

## ORDER

Before the Court is the United States of America's Motion for Summary Judgment.(R. Doc. 35). The deadline for filing an opposition has expired. LR 7(f). Accordingly, the motion is unopposed.

**I.    Background**

On June 29, 2018, the United States of America ("United States" or "Government") filed a Verified Complaint for Forfeiture In Rem. (R. Doc. 1). The United States commenced this action pursuant to the civil forfeiture provisions of 21 U.S.C. § 881(a)(6), seeking forfeiture of $179,000 in United States Currency seized from a JPMorgan Chase Bank safe deposit box in the name of Travis James ("Defendant Currency"). (R. Doc. 1). The United States obtained the Defendant Currency, which consists of stacks of $100 bills rubber-banded together, on June 13, 2017, through the execution of a federal search warrant. (R. Doc. 1 at 3). The United States alleges that the Defendant Currency is subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6) "because it represents moneys, negotiable instruments and other things of value furnished and intended to be furnished in exchange for a controlled substance, or proceeds traceable to such

exchanges, or money used or intended to be used to facilitate any drug offense, in violation of 21 U.S.C. § 841." (R. Doc. 1 at 4).

On July 18, 2019, Travis James ("James") filed an Answer. (R. Doc. 6). James denies "that the seized currency was furnished or intended to be furnished by any person in exchange for a controlled substance, or are proceeds traceable to such an exchange or any illegal conduct, or are monies used or intended to be used to facilitate a drug offense or offense of any nature." (R. Doc. 1 at 1). James asserts that the Defendant Currency was obtained "from a lawfully gained enterprise and had absolutely no relationship whatsoever to any purported criminal conduct of any nature." (R. Doc. 6 at 1). James further asserts that the United States "has no basis for seizing the monies associated with this matter because such were derived from a legitimate, non-criminal conduct of any nature source and are completely unrelated to any other allegation set forth in the companion matter identified as United States District Court, Middle District of Louisiana, Criminal Number 18-21-SDD-RLB." (R. Doc. 6 at 2). James subsequently filed a Claim of Ownership. (R. Doc. 10).

On August 21, 2018, the Court stayed discovery in this civil forfeiture proceeding until the resolution of the related criminal case, *United States of America v. Travis R. James, et al.*, No. 18-cr-21-SDD-RLB (M.D. La.). (R. Doc. 14). James pled guilty to drug trafficking charges on October 27, 2020. *Travis*, No. 18-cr-21, ECF No. 786. The Court lifted the stay of discovery in this civil forfeiture action on November 25, 2020. (R. Doc. 21).

On January 26, 2021, the parties consented to proceed before the undersigned in accordance with 28 U.S.C. § 636(c). (R. Doc. 26, 27).

On July 21, 2021, the deadline to file dispositive motions, the United States filed the instant Motion for Summary Judgment. (R. Doc. 35). Consistent with Local Rule 7(f), the Court

set a briefing schedule requiring Plaintiff to file any opposition within 21 days from the filing of the Motion for Summary Judgment. (R. Doc. 36). James has not filed an opposition as of the date of this ruling.

For the following reasons, the Court will grant the United States' Motion for Summary Judgment.

## II.     Law and Analysis

### A.     Legal Standards for Summary Judgment

Summary judgment shall be granted when there are no genuine issues as to any material facts and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56. When a motion for summary judgment is properly made and supported under Rule 56(c), the opposing party may not rest on the mere allegations of their pleadings, but rather must come forward with "specific facts showing that there is a genuine issue for trial." *Matsushita Electric Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); Fed. R. Civ. P. 56(c)(1). The non-movant's evidence is to be believed for purposes of the motion and all justifiable inferences are to be drawn in the non-movant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, summary judgment must be entered against the plaintiff, if he or she fails to make an evidentiary showing sufficient to establish the existence of an element essential to his or her claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Without a showing sufficient to establish the existence of an element essential to the plaintiff's claim, there can be "no genuine issue as to any material fact since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all facts immaterial." *Celotex Corp.*, 477 U.S. at 323.

A moving party must support an assertion that a fact cannot be genuinely disputed by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). Local Rule 56 details the requirements for statements of material facts. "A motion for summary judgment shall be supported by a separate, short, concise statement of material facts, each set forth in separately numbered paragraphs, as to which the moving party contends there is no genuine issue of material fact to be tried." LR 56(b)(1). "Facts contained in a supporting or opposing statement of material facts, if supported by record citations as required by this rule, shall be deemed admitted unless properly converted." LR 56(f).

**B.    The Undisputed Material Facts**

The Court has reviewed the United States' Statement of Undisputed Material Facts (R. Doc. 35-1 at 2-7), the referenced record citations to the related criminal proceeding, and the following documents submitted in support of summary judgment: photographs and records of the seized cash totaling $179,000 (R. Doc. 35-2 [Ex. 1], 35-3 [Ex. 2]) the Declaration of Special Agent Andre Guilott with the Internal Revenue Service, Criminal Investigation Division (R. Doc. 35-4 [Ex. 3]); the attachments to the Guilott Declaration (R. Docs. 35-5 [Ex. 3a], 35-6 [Ex. 3b], 35-7 [Ex. 3c]); James' Responses to the United States' First Set of Interrogatories and Requests for Production (R. Doc. 35-8 [Ex. 4]); James' state court criminal records (R. Docs. 35-9 [Ex. 5], 35-10 [Ex. 6]); photographs of $118,835 in seized cash proceeds (R. Doc. 35-11 [Ex. 7]); James' tax records for 2014 (R. Doc. 35-12 [Ex. 8]); James' tax records for 2015 (R. Doc. 35-13 [Ex. 9]); James' tax records for 2016 (R. Doc. 35-14 [Ex. 10]); Travis James Entertainment, LLC's tax records for 2014 (R. Doc. 35-15 [Ex. 11]); the deposition transcript of

4

Martina Rowe, James' tax preparer (R. Doc. 35-16 [Ex. 12]); and records from the Louisiana Office of Motor Vehicles (R. Docs. 35-17 [Ex. 13], 35-18 [Ex. 14]).

As there is no opposition to the instant Motion for Summary Judgment, or Opposing Statement of Material Facts under Local Rule 56(c), the Court concludes that the facts contained in the United States' Statement of Undisputed Facts are admitted for the purposes of determining whether summary judgment is appropriate. *See* Fed. R. Civ. P. 56(e); LR 56(f)-(g).

The following facts, which are derived from the United States' Statement of Undisputed Facts, are undisputed:

1. On June 13, 2017, law enforcement officials executed a search and seizure warrant for the JP Morgan Chase safe deposit box in the name of James and discovered and seized 1,790 one hundred-dollar bills, totaling $179,000 in U.S. currency. (Ex. Nos. 1-3).

2. On October 27, 2020, James pled guilty at his re-arraignment in the related criminal case to the large-scale trafficking of drugs. *Travis*, No. 18-cr-21, ECF No. 786. In his signed plea agreement, James admitted that, from approximately January 2015 until May 2019, he regularly bought multi-kilogram amounts of cocaine and later sold cocaine and cocaine base for profit in Baton Rouge and elsewhere, including approximately ten to eleven kilograms of cocaine that he purchased in May 2017 for $280,000 for subsequent re-sale. *Travis*, No. 18-cr-21, ECF No. 784, at 7, 9. He agreed to forfeit any property involved in the offenses and admitted that the amount of the property involved in the offenses are drug proceeds including, but not limited to, the $18,100 in cash possessed by James on June 13, 2017, the $280,310 in cash found on June 13, 2017, in the attic of the defendant's house, and the $118,835 in cash found on March 9, 2018, in a storage unit controlled by James. *Id.*, at 5, 12-13. He also admitted that the $107,950 in cash found on Joshua Mansion and the $92,155 in cash found on C.J. Carter was done at his direction and was

5

to be used to purchase heroin and cocaine in Houston. *Id*., at 12. However, James did not agree that the Defendant Currency was drug proceeds and the parties agreed that James' forfeiture claim to the Defendant Currency would be litigated at a later time. *Id*., at 6.

    3. In addition to his arrest and conviction of the drug trafficking charge in this matter, James pled guilty to possession with intent to distribute cocaine for an arrest on September 6, 2005, in East Baton Rouge Parish. (Ex. No. 5). James also he pled guilty to possession of cocaine for an arrest on April 25, 2006, in East Baton Rouge Parish. (Ex. No. 6).

    4. On February 2, 2021, Yascia Lafrance, James' girlfriend, pled guilty in the same related criminal case to conspiracy to distribute and possess with the intent to distribute 100 grams or more of a substance containing a detectable amount of heroin, 500 grams or more of a substance containing a detectable amount of cocaine, and 28 grams or more of a substance containing a detectable amount of cocaine base ("crack"). *Travis*, No. 18-cr-21, ECF No. 827. She admitted to conspiring with James and others from January 2015 until May 2019 to obtain and distribute heroin, cocaine, and cocaine base. *Id*., at 6. Furthermore, Lafrance agreed that, on June 13, 2017, she possessed $280,310 in cash, which was drug proceeds and which cash was "concealed in the attic" of "the home she shared with Travis James." *Id*., at 11.

    5. On September 1, 2020, Belinda Carter, with whom James has a child, pled guilty in the same related criminal case to possession with intent to distribute cocaine. 18-cr-21, ECF No. 765. In her plea agreement, she admitted that James was a cocaine dealer in March 2018 and for at least several months before that. *Id*., at 6. She also admitted that, on March 9, 2018, acting under James' instructions, she showed another individual $118,835 in cash at a storage unit, which cash was the proceeds of James' cocaine sales. *Id*., at 5-6; (*see also* Ex. No. 7).

6

6. On April 29, 2021, D'Mari Harding pled guilty in the same related criminal case to conspiracy to distribute and possess with the intent to distribute cocaine, cocaine base, and heroin. *Travis*, No. 18-cr-21, ECF No. 917. In his plea agreement, he admitted that he was a trusted and close drug trafficking associate of James, and managed James' rap music business, Travis James Entertainment, LLC. *Travis*, No. 18-cr-21, ECF No. 919, at 6. Harding also admitted to helping James obtain multi-kilogram amounts of cocaine in Houston and elsewhere, convert much of it into cocaine base, distribute the cocaine and cocaine base for sale, and store the drug proceeds. *Id.*, at 6-7.

7. The United States obtained James' federal tax returns for the years 2014-2016. His total income for 2014 was listed as $98,101, allegedly from Travis James Entertainment, LLC. (Ex. Nos. 8, 11). His total income for 2015 was listed as $86,997, allegedly from Travis James Entertainment, LLC. (Ex. No. 9). His total income for 2016 was listed as $106,457, also allegedly from Travis James Entertainment, LLC. (Ex. No. 10). In the 2015 tax return, he listed $44,153 as his total expenses before expenses for business use of home. (Ex. No. 9). In the 2016 tax return, he listed $49,693 as the total expenses before expenses for business use of home. (Ex. No. 10).

8. On April 15, 2021, Martina Rowe was deposed. When asked what information she requires from her clients to complete their tax returns, she stated, "I need basically your income and your expenses" and that "[a]s long as you provide me that on documents, I just file it." (Ex. No. 12, at 14). She stated, "I didn't verify anything" and she did not question the accuracy or the truthfulness of the numbers provided by her clients "as long as you give it to me in writing." (Ex. No. 12, at 28-31, 40). For all of the information provided in James' 2014, 2015, and 2016 tax returns, Rowe "took [his] word for it for income and expenses." (Ex. No. 12, at 33-34). Rowe

7

had no knowledge of James' supposed winnings at casinos, receipt of money from the sales of vehicles, a supposed buy-out of a performance contract for $50,000, or his supposed preference for only getting paid in one hundred-dollar bills. (Ex. No. 12, at 38-40). Rowe had no idea if the Defendant Currency was drug proceeds or from the supposed income listed on his tax returns. (Ex. No. 12, at 47-48).

    9. Law enforcement officials analyzed the business bank account of Travis James Entertainment, LLC, four personal bank accounts held by James and his wife/girlfriend, Belinda Carter, and a bank account held by Yascia Lafrance. (Ex. Nos. 3, 3a-3c). An analysis of James' business and joint personal bank accounts revealed that, in 2015, the total net deposits into these five accounts was $148,432, $140,963 of which were cash deposits. (Ex. Nos. 3, 3a). In 2016, the total net deposits into these five accounts was $173,423, $146,413 of which were cash deposits. (Ex. Nos. 3, 3b). In 2017, the total net deposits into these five accounts was $73,388, $35,740 of which were cash deposits. (Ex. Nos. 3, 3c). The aggregate total deposited during this time was $395,243 and the aggregate total in cash deposited in this 2 1/2-year period was $323,116. (Ex. No. 3). The large majority of the remaining deposits were transfers from other accounts held by James. (Ex. No. 3).

    10. The net disbursements from these accounts, which James had access to, were $135,228 in 2015, $183,754 in 2016, and $109,226 through June 2017. (Ex. Nos. 3, 3a-3c). The aggregate net disbursements for these 2 1/2 years equaled $428,208. (Ex. No. 3). The net disbursements exceeded the net deposits of $395,243. (Ex. No. 3). Therefore, all the reported income was disbursed from the bank accounts. (Ex. No. 3).

    11. A review of the debits from these accounts, including the Travis James Entertainment, LLC account, did not reveal any apparent operating expenses such as expenses

for rent, employee wages, supplies, and the cost of goods sold for such items as clothing or CDs. (Ex. No. 3). The most significant disbursements from the Travis James Entertainment, LLC account included expenses for rental cars and hotels. (Ex. No. 3). From January 2015 until June 2017, approximately $17,000 was spent on rental cars at Hertz Rental Cars. (Ex. No. 3). These disbursements do not include fees spent on other rental car companies including Enterprise. (Ex. No. 3). James admitted that he "and others paid $19,763 for rental cars from Enterprise on more than 50 occasions as well as renting vehicles from Hertz and Budget rent a car, to promote and carry on their drug trafficking." *Travis*, No. 18-cr-21, ECF No. 784, at 13. From January 2015 until June 2017, approximately $12,000 was spent on hotels.com. (Ex. No. 3). These disbursements do not include funds disbursed for other hotels not booked and purchased through hotels.com. (Ex. No. 3).

12. According to the Louisiana Office of Motor Vehicles, James donated his 1984 Oldsmobile Cutlass on April 10, 2018. (Ex. No. 13). According to the Louisiana Office of Motor Vehicles, James transferred title to his 2009 Jaguar XF to Lee Williams on November 9, 2016. (Ex. No. 14). The cost of the vehicle was listed as $100.00. (Ex. No. 14).

13. Law enforcement officials requested information from the Louisiana Department of Labor for James for the period January 1, 2015, through May 2017. (Ex. No. 3). The Department of Labor did not have any reported income for James for this period. (Ex. No. 3).

14. On June 13, 2017, law enforcement officials seized a total of $677,515 in cash from two individuals at James' direction and from several locations under James' control. (Ex. No. 3). On June 13, 2017, law enforcement executed a search and seizure warrant of the JP Morgan Chase safe deposit box in the name of James and found 1,790 one hundred-dollar bills, totaling $179,000 in U.S. currency. (Ex. Nos. 1-3). Also on June 13, 2017, during the execution of a

9

search warrant at the house that James and Lafrance resided, law enforcement found and seized $280,310 in cash concealed in the attic. *Travis*, No. 18-cr-21, ECF No. 784, at 12; (Ex. No. 3). The same day, Joshua Mansion and C.J. Carter were apprehended from a Greyhound bus, carrying cash in the total amount of $200,105, mostly concealed in their underwear, and carrying the cash at James' direction to be used to purchase heroin and cocaine in Houston. *Travis*, No. 18-cr-21, ECF No. 784, at 12; (Ex. No. 3). Also, on June 13, 2017, during the execution of a search warrant at a stash house on Barque Drive in Prairieville, Louisiana, law enforcement officials seized $18,100 in cash determined to be possessed by James. *Travis*, No. 18-cr-21, ECF No. 784, at 12; (Ex. No. 3). On March 9, 2018, law enforcement agents executed a search warrant at storage unit number 127 at Storage Cube storage facility located at 8566 Siegen Lane, Baton Rouge, Louisiana. Ex. No. 3; *Travis*, No. 18-cr-21, ECF No. 784, at 13. In the storage unit, the agents found three bags of U.S. currency totaling $118,835 inside a black trash bag. (Ex. No. 3). James admitted that the $280,310, the $200,105, the $18,100, and the $118,835 in cash seized were all proceeds of drug trafficking. *Travis*, No. 18-cr-21, ECF No. 784, at 5, 12-13. However, he denied that the Defendant Currency was the proceeds of drug trafficking. *Id*., at 6.

### C. Defendant Currency is Subject to Forfeiture

#### 1. The Legal Standard for Forfeiture

The United States seeks civil forfeiture of Defendant Currency pursuant to 21 U.S.C. § 881(a)(6), which states in pertinent part:

> All moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance ... all proceeds traceable to such an exchange, and all moneys, negotiable instruments, and securities used or intended to be used to facilitate any violation of this subchapter [shall be subject to forfeiture to the United States and no property right shall exist in them].

21 U.S.C. § 881(a)(6).

The Civil Asset Forfeiture Reform Act of 2000 ("CAFRA"), codified at 18 U.S.C. § 983, governs civil forfeiture proceedings in the federal courts. *United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008). In a civil forfeiture case, the Government bears the initial burden to establish, by a preponderance of the evidence, that the property at issue is subject to forfeiture.18 U.S.C. § 983(c)(1). To meet its burden, the Government may use evidence gathered after the filing of a complaint for forfeiture. 18 U.S.C. § 983(c)(2). If, as here, the Government's theory of forfeiture is that the property was involved in the commission of a drug trafficking offense, it must establish a "substantial connection" between the property and the offense. 18 U.S.C. § 983(c)(3); *see United States v. $89,980.00 in U.S. Currency*, No. 11–309, 2012 WL 6020041, at *4 (S.D. Tex. Nov. 9, 2012).

A "substantial connection" can be proven with direct or circumstantial evidence. *See United States v. 2004 Ferrari 360 Modeno*, 544 Fed. App'x 545, 545 (5th Cir. 2013). Significantly, the Government need not "trace the property to a particular drug transaction," so long as "the totality of the circumstances . . . leads to a finding" of such a connection. *United States v. One 1987 Mercedes 560 SEL*, 919 F.2d 327, 331 (5th Cir. 1990) (citing *United States v. $4,255,625.39 in U.S. Currency*, 762 F.2d 895, 903 (11th Cir. 1985); *Illinois v. Gates*, 462 U.S. 213, 244 n. 13 (1983)); *see also United States v. Funds in the Amount of $30,670.00*, 403 F.3d 448, 467 (7th Cir. 2005) (the "totality of the circumstances" led to the only reasonable conclusion that a "cash hoard was substantially connected to illegal drug trafficking and properly the subject of forfeiture); *United States v. $67,220.00 in U.S. Currency*, 957 F.2d 280, 284 (6th Cir. 1992) ("The aggregation of facts, each one insufficient standing alone, may suffice to meet the government's burden.").

**2.     Analysis**

In arguing that the Defendant Currency is the proceeds of drug trafficking, the United States first asserts that James is a large-scale drug dealer who lacks legitimate income. (R. Doc. 35-1 at 9-14). The United States asserts that the information in James' tax returns, bank accounts, and other documents do not support a finding that James had legitimate income, noting that James did not provide any documents to support his claim that Defendant Currency was obtained through legitimate means. (R. Doc. 35-1 at 9-12). The United States also asserts that the circumstantial evidence surrounding the law enforcement seizure of $796,350 in cash under James' control (including $617,350 in cash seized that James admitted were the proceeds of drug trafficking) supports a finding that the remaining $179,000 (the Defendant Currency) is also the proceeds of drug trafficking. (R. Doc. 35-1 at 13).

"A claimant's record of drug activity is a highly probative factor in the forfeiture calculus." *$67,220.00 in U.S. Currency*, 957 F.2d at 286. The evidence supports a finding that James is a large-scale drug trafficker and has been for several years, including when the Defendant Currency was seized on June 13, 2017. James pled guilty to the drug trafficking charge in the related criminal case and admitted to regularly buying multi-kilogram amounts of cocaine and later selling cocaine and cocaine base for profit in Baton Rouge and elsewhere from approximately January 2015 until May 2019. Pursuant to search warrants related to James' drug trafficking, law enforcement officials seized $677,515 in cash that was under James' control or being transported at his direction on June 13, 2017. James has admitted that the seized amounts of $280,310 (concealed in the attic), $200,105 (on Joshua Mansion and C.J. Carter when they were apprehended from a Greyhound bus), and $18,100 (found in a stash house) were all proceeds of drug trafficking. James has not submitted any evidence, however, in support of a

finding that the Defendant Currency (179,000 $100 bills rubber-banded together in a safe deposit box) seized on the same day were not also proceeds of drug trafficking.[1]

James' possession of large sums of cash at the same time as his engagement in drug activity, including the Defendant Currency, provides "strong evidence that the cash is connected with drug activity." *United States v. $84,615 in U.S. Currency*, 379 F.3d 496, 501-02 (8th Cir. 2004)); *see also United States v. $252,300.00 in U.S. Currency*, 484 F.3d 1271, 1275 (10th Cir. 2007) ("A large amount of currency, while not alone sufficient to establish a connection to a drug transaction, is 'strong evidence' of such a connection.") (quoting *United States v. $149,442.43 in U.S. Currency*, 965 F.2d 868, 877 (10th Cir. 1992)). In addition, the very nature of the manner in which the Defendant Currency was packaged and stored (179,000 $100 bills rubber-banded together in a safe deposit box) has significant probative value with respect to whether the Defendant Currency is indicative of drug proceeds. *See United States v. $242,484.00*, 389 F.3d 1149, 1161-62 (11th Cir. 2004) ("A common sense reality of everyday life is that legitimate businesses do not transport large quantities of cash rubber-banded into bundles and stuffed into packages in a backpack.").

"In civil forfeiture cases, the absence of an apparent, verifiable, or legitimate source of substantial income is probative evidence of a substantial connection to illegal activity." *United States v. $52,000.00, More or Less, in U.S. Currency*, 508 F. Supp. 2d 1036, 1042 (S.D. Ala. 2007); *see also United States v. Thomas,* 913 F.2d 1111, 1115 (4th Cir. 1990) ("Evidence that cash expenditures [by claimant]—a suspected drug trafficker—hugely exceeded any verifiable income suggests that the money was derived illegally."); *United States v. $250,000 in United States Currency,* 808 F.2d 895, 899 (1st Cir.1987) ("The absence of any apparent legitimate

---

[1] Law enforcement subsequently seized $118,835 (stored in a black trash bag at a storage facility) that James has admitted consists of proceeds of drug trafficking.

13

sources for the [Currency] suggests that the money is derived from drug transactions."). While the income listed in James' tax returns is allegedly from Travis James Entertainment, LLC, James has not submitted any evidence to verify that alleged source of income or its relation to the Defendant Currency. Furthermore, James has failed to set forth any argument or pointed the Court to any summary judgment type evidence that any withdrawals from his bank accounts, including the Travis James Entertainment, LLC account, were for legitimate expenses such as operating costs for his rap music business as claimed on his tax returns.

The evidence set forth by the United States demonstrates that nearly all deposits into James' bank accounts were either cash or transfers from other accounts he controlled; there is no evidence of any apparent operating business related to Travis James Entertainment, LLC; and the figures reported on James' tax returns cannot be verified.

At most, the record contains certain unsubstantiated assertions by James in response to interrogatories. In those responses, James claimed that all of the Defendant Currency was from legitimate means including proceeds from gambling winnings, the sale of two vehicles, clothing and CD sales, and a buy-out of a contract. (R. Doc. 35-8). Among other things, James claimed that he earned between $87,000 and $107,000 from "CD sales, cloth[ing] sales, [and] artist shows," and that he insisted in cash payments of $100.00 bills because "[e]ver since [he] was a young man [he] always preferred the $100.00 bill over all bills and it has stuck with [him] until now." (R. Doc. 35-8 at 2-3). The United States asserts that James "did not provide any documents to support these allegations" made in discovery. (R. Doc. 35-1 at 11). Furthermore, with respect to alleged earnings from the sale of his two vehicles, the evidence also shows that James donated his 1904 Oldsmobile Cutlass after the seizure of the Defendant Currency and he transferred the title to his 2009 Jaguar XF for the sum of only $100.

James has not now come forth with any evidence in support of the unlikely assertion that he obtained the Defendant Currency through legitimate means with no substantial connection to illegal drug trafficking. The lack of any evidence supporting James' claims that he amassed the $179,000 by legitimate means favors a finding that the United States has met its burden. *See United States v. $174,206.00,* 320 F.3d 658, 662 (6th Cir.2003) (finding that a lack of legitimate income sufficient to explain large amounts of cash "unrebutted by any evidence pointing to any other source of legitimate income or any evidence indicating innocent ownership, satisfies the burden imposed by the statute [to establish a substantial connection]."). *United States v. Seventy-Four Thousand Seven Hundred Dollars ($74,700 In U.S. Currency)*, No. 06-0736, 2008 WL 1805432, at *4 (M.D. Ala. Apr. 18, 2008) ("Claimant offers no explanation for how he legitimately amassed the large sum of money seized from his residence, which strongly suggests he was involved in illegal activity. The amount of currency and lack of evidence of a legitimate income are highly probative of a substantial connection with illegal drug trafficking.").

Having considered the evidence in its totality, including the United States' Statement of Undisputed Material Facts and supporting evidence, the Court finds that there are no genuine issues as to any materials fact in this action. Having considered the evidence in its totality, the Court finds that the United States has met its burden of establishing, more likely than not, that the Defendant Currency was substantially connected to illegal drug trafficking and is properly the subject of forfeiture pursuant to 21 U.S.C. § 881(a)(6).

### III.  Conclusion

Based on the foregoing,

**IT IS ORDERED** that the United States of America's Motion for Summary Judgment.(R. Doc. 35) is **GRANTED**, and the United States is now entitled to possession of the

Defendant Currency. The Defendant Currency is condemned, forfeited, and vested in the United States and shall be disposed of according to law.

Signed in Baton Rouge, Louisiana, on September 30, 2021.

---

**RICHARD L. BOURGEOIS, JR.**
**UNITED STATES MAGISTRATE JUDGE**